## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JILL A. W.,

                Plaintiff,

      v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                Defendant.

Case No. 20 C 3854

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Jill A. W. seeks judicial review of the final decision of the Acting Commissioner of Social Security denying her claim for disability insurance benefits ("DIB"). Jill seeks reversal of the ALJ's decision and remand, and the Commissioner seeks an order affirming the decision.[1] For the following reasons, the Court affirms the ALJ's decision.

## BACKGROUND

Jill applied for DIB on October 2, 2017, alleging disability since June 29, 2016 due to Ehlers-Danlos syndrome, fibromyalgia, small fiber peripheral neuropathy, left side weakness with foot drop, chronic fatigue, spinal neuritis, autonomic dysfunction, hypothyroidism, left hip pain with labrum tear and osteoarthritis, and sleep disorder.[2] She has a history of chronic migraine headaches, an eating disorder, insomnia, irritable bowel syndrome, post-traumatic stress disorder, generalized anxiety disorder, depression, and medication overuse. Born on May 24, 1970, Jill was

---

[1]     The Court ordered the parties to include in their briefs a list of the specific questions presented in support of remand or affirmance. Doc. 9. That order was ignored as neither party included a list of questions presented. Failure to include a list of questions presented in the future may result in the Court striking the briefs. *Shaw v. Kijakazi*, 2022 WL 45030, at *1 n.2 (N.D. Ill. Jan. 5, 2022).

[2]     Ehlers-Danlos syndrome is a connective-tissue disorder. *Pate v. Kijakazi*, 2021 WL 3627118, at *1 (7th Cir. 2021).

46 years old as of the alleged onset date. In July 2016, she completed a 3-week program at the Mayo Clinic's Pain Rehabilitation Center with medication withdrawal to help her manage her pain more effectively. In March 2017, Jill returned to the Mayo Clinic, where a diagnosis of fibromyalgia was confirmed and a thermoregulatory sweat test was consistent with a small fiber peripheral neuropathy. She completed eating disorder outpatient treatment in March 2017. Jill also underwent a successful total left hip replacement on November 1, 2017. Jill has an MBA from the University of Chicago and last worked as the vice president of a dairy manufacturing firm from November 2010 to June 26, 2016. Prior to that, she worked as the chief information officer for a greeting card company for approximately five years.

On June 5, 2019, the administrative law judge ("ALJ") issued a decision denying Jill's application (R. 65-76). The ALJ concluded that Jill's migraine headaches, Ehlers-Danlos syndrome, degenerative joint disease of the left hip, status post total arthroplasty, bilateral knee osteoarthritis, peripheral neuropathy, fibromyalgia/chronic pain syndrome, degenerative disc disease of the lumbar spine, and hypothyroidism were severe impairments, but did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. *Id*. at 67-70. The ALJ then determined that Jill had the residual functional capacity ("RFC") to perform a limited range of sedentary work except that she can: never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; frequently reach in all directions, handle, finger and feel bilaterally; and occasionally have exposure to unprotected heights and dangerous heavy moving machinery. *Id*. at 70-75. Based on the vocational expert's testimony, the ALJ found that Jill is able to perform her past relevant work as a user support analyst supervisor and vice president as generally performed. *Id*. at 75-76. As a result, the ALJ found that Jill was

not disabled from June 29, 2016 through the date of the decision. *Id*. at 76. The Social Security

Appeals Council denied Jill's request for review on May 1, 2020. *Id*. at 1-7.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether

a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt.

P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5)

whether the claimant is unable to perform any other available work in light of her age, education,

and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.

2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative

answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.

A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination

that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d

160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings

are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d

936, 940 (7th Cir. 2002). Substantial evidence "means—and means only—'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139

S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 US 197, 229 (1938)).

"Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

In her support of her request for reversal and remand, Jill argues that the ALJ: (1) erred in assessing the opinion evidence; (2) improperly evaluated her statements regarding the limiting effects of her symptoms; (3) failed to properly accommodate her limitations from depression, neuropathy, migraine headaches, antalgic gait and cane use in the RFC; and (4) erred at step four in finding that Jill could perform her past jobs as they are generally performed in the economy. Because the ALJ's decision is supported by substantial evidence, which is only "more than a mere scintilla" and a reasonable mind can accept this evidence as adequate to support the conclusion, the Court affirms. *Biestek*, 139 S.Ct. at 1154.

## A.    Medical Opinion Evidence

Jill first challenges the ALJ's evaluation of the medical opinion evidence. Jill submitted medical opinion evidence from four treating physicians: Dr. Alexandru Barboi, Dr. Susan Rubin, Dr. Lalit Puri, and Dr. Victoria Brander. Each completed a "Work Status Sheet" form for Principal Financial Group. The ALJ did not rely on the forms prepared by these four treating physicians. Instead, the ALJ found the opinion of Dr. Subramanium Krishnamurthi, an impartial medical expert who testified at the hearing, partially persuasive. The Court finds no error in the ALJ's evaluation of the medical opinion evidence.

Given Jill's filing date, the ALJ's evaluation of the medical opinion evidence was subject to new regulations pertaining to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c (2017). Under the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ is required to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). The regulations direct the ALJ to consider the persuasiveness of medical opinions using several listed factors, including supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a), (c). Supportability and consistency are the two most important factors. 20 C.F.R. § 404.1520c(a). An ALJ must explain how she considered the factors of supportability and consistent in her decision, but she is not required to explain how she considered the other factors (such as the provider's specialization). 20 C.F.R. § 404.1520c(b)(2).

### 1. Dr. Alexandru Barboi

Dr. Barboi is a neurologist who Jill saw on October 31, 2017 for an autonomic assessment. (R. 935-50). He completed a Work Status Sheet form on October 30, 2018. (R. 357-58). In this form, Dr. Barboi: (1) listed Jill's diagnosis as autonomic neuropathy with symptoms of dizziness, pain, temperature regulation, sweating, constipation, diarrhea, and joint pain; (2) opined that Jill could not perform any occupation on a part-time basis; (3) determined that Jill could occasionally sit, stand, and walk; could occasionally lift 10 pounds; could never climb/balance, stoop/kneel, or crouch/crawl; and could occasionally reach/handle, push/pull with her hands, and engage in fine manipulation and keyboarding; (4) noted "worsening" symptoms of dizziness, pain, temperature regulation, sweating, constipation, diarrhea, and joint pain; (5) indicated her treatment plan included medications, physical therapy, and hip surgery; and (6) opined that the restrictions and limitations were expected to be permanent. *Id*.

The ALJ found Dr. Barboi's opinion not persuasive. (R. 74). The ALJ provided sufficient reasons for disregarding Dr. Barboi's opinion and her analysis is supported by more than a mere scintilla of evidence. First, the ALJ correctly found that Dr. Barboi's opinion that Jill could not work part-time is an issue reserved to the Commissioner, and such statement is neither "valuable nor persuasive" under the new regulations. 20 C.F.R. § 404.1520b(c)(3)(i). Moreover, the ALJ permissibly discounted Dr. Barboi's opinion that Jill could not perform any job because there is no evidence that he has the requisite vocational expertise. *Gribben v. Kijakazi*, 2022 WL 59404, at *2 (7th Cir. 2022) (treating physician's "opinion that no job was suitable for [claimant] requires vocational expertise . . . and [claimant] does not argue that [treating physician] has such expertise."). Second, regarding the supportability factor, the ALJ found Dr. Barboi's conclusions about Jill's limitations unsupported by the objective evidence, specifically: Jill often demonstrated normal posture, strength, and gait; diagnostic imaging of the lumbar spine and knees revealed minimal degenerative changes; and Jill was observed to be doing well after her November 1, 2018 left hip surgery and no restrictions were assessed. (R. 74). Further, Dr. Barboi's own autonomic testing results, which he indicated would "find out about the pattern and severity involved," were normal. *Id.* at 934, 949. Therefore, the ALJ reasonably discounted Dr. Barboi's opinion. 20 C.F.R. § 404.1527(c)(3) (supportability refers to whether the medical source provides relevant "medical signs and laboratory findings" to support a medical opinion); *Vang v. Saul*, 805 F. App'x 398, 401 (7th Cir. 2020) ("An ALJ may give less weight to an opinion that is unsupported by objective evidence.").[3]

---

[3] Jill raises many challenges to the ALJ's finding that Dr. Barboi's limitations were not supported by the medical record, but none of them establishes error in the ALJ's evaluation of Dr. Barboi's opinion. Jill points out that for the most part, her pre-hip surgery treatment records indicate abnormal gait. Doc. 19 at 4. Notably, Jill's argument fails to address the substantial evidence the ALJ relied on that showed Jill's improvement after hip surgery, including that Jill's orthopedic surgeon (Dr. Puri) stated she was "doing well" and had "no restrictions." (R. 73, 74, 1574). Moreover, the physical therapy records after Dr. Puri

In challenging the ALJ's evaluation of Dr. Barboi's opinion, Jill criticizes the ALJ's consideration of evidence indicating normal gait, posture, and strength, generally normal physical examinations, and diagnostic testing results. Doc. 19 at 4. Jill claims the ALJ's assessment of the record demonstrates a misunderstanding of Jill's primary impairments of hypermobile Ehlers Danlos syndrome, autonomic dysfunction, chronic fatigue, and fibromyalgia because her symptoms cannot be objectively verified by diagnostic testing. *Id*.[4] The Court disagrees and finds no error in the ALJ's analysis.

It is true that "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018); *see also Coffee v. Berryhill*, 2019 WL 302680, at *3 (N.D. Ind. Jan. 22, 2019) (a "claimant with Ehlers-Danlos is analogous to a claimant with fibromyalgia" and "laboratory, x-ray, or physical

---

assessed no restrictions fail to show an abnormal gait. *Id*. at 1476-78, 1482-87. Jill next contends that "she fatigued during the day warranting use of a cane." Doc. 19 at 4. Jill cites physical therapy records from November and December 2018, the period immediately following her hip surgery, when ambulation with a cane would be expected. Jill fails to acknowledge that her physical therapy records between January and March 2019 noted that she reported only using a cane "by [the] end of [the] day" due to knee pain. (R. 1476, 1482, 1485, 1488, 1491, 1494, 1497, 1500, 1503, 1507). At the hearing, Jill testified that on some days, she uses a "cane in the evenings when [her] body is more fatigued." *Id*. at 95. Thus, the record reflects that after her initial post-surgery physical therapy rehabilitation, Jill only sometimes used a cane at the end of the day. In any event, Jill has not explained how her sometimes needing a cane at the end of the day undermines the ALJ's finding that Dr. Barboi's assessed limitations are not supported by the objective evidence. Regarding Jill's resolved hip pain after surgery, Jill argues the ALJ should have considered that those same records evidence knee pain. Doc. 30 at 5, 7 (citing 1406, 1574). However, Jill fails to address that Dr. Puri's March 4, 2019 examination revealed both knees near neutral alignment and he was unable to appreciate any hypermobility with her patellae. *Id*. at 1574. X-rays of Jill's knees that day showed only minimal degenerative change. *Id*. Dr. Puri recommended that Jill continue with physical therapy to manage her knee symptoms but assessed no functional restrictions despite Jill's knee symptoms. *Id*. at 1485, 1574. Finally, Jill highlights a single note from February 12, 2019, where she reported to her physical therapist that "every day between 11am-1pm she needs to rest due to dizziness, disorientation, fogginess. Repeats around 7 pm." *Id*. at 1494. But subsequent records did not document similar ongoing symptoms, and the ALJ considered and properly rejected Jill's claim that she lies down two to four hours a day. *Id*. at 71, 73, 1476, 1482, 1485, 1488, 1491.

[4]      Jill raises a similar argument about the relevance of normal examination findings and minimal degenerative changes shown on objective testing with respect to the ALJ's conclusion that Dr. Krishnamurthi's opinion was partially supported by the medical record. Doc. 30 at 2-3. For the same reasons discussed above, the Court finds this argument unconvincing.

findings might not necessarily indicate the level of pain suffered."). However, because Jill suffers from physical impairments other than hypermobile Ehlers Danlos syndrome, autonomic dysfunction, chronic fatigue, and fibromyalgia it was appropriate for the ALJ to consider whether the objective findings were consistent with Dr. Barboi's opinion. *Kinnari A. v. Saul*, 2020 WL 1863291, at \*9 (N.D. Ill. April 14, 2020). Findings of normal posture, strength, and gait and minimal degenerative changes revealed by x-rays of the spine and knees and a lumbar spine MRI are certainly relevant to the severity of Jill's other severe impairments of degenerative joint disease of the left hip, status post total hip arthroplasty, bilateral knee osteoarthritis, and degenerative disc disease of the lumbar spine, so the absence of abnormal studies and clinical findings is a sufficient reason to reject Dr. Barboi's opinion about Jill's limitations, which was based in part on her severe hip condition warranting surgery. Moreover, the ALJ did not rely solely on normal examination findings and diagnostic imaging results in finding Dr. Barboi's assessed limitations not supported by the record, and the other evidence the ALJ cited supports her weighing of Dr. Barboi's opinion. Specifically, the ALJ highlighted that after her left hip surgery, Jill complained of no hip pain, she was able to ambulate independently, and her orthopedic surgeon noted that she was doing well and had no physical restrictions. (R. 73, 74). Thus, the ALJ properly considered whether Dr. Barboi's opinion was consistent with the broader medical record after surgery showing significant improvement and no restrictions.

### 2. Dr. Susan Rubin

Similarly, the ALJ found Dr. Rubin's October 2018 opinion not persuasive. Dr. Rubin is a neurologist and began treating Jill for her migraines in April 2016. (R. 687). Dr. Rubin wrote on a Work Status Sheet that Jill was "currently incapacitated and scheduled for surgery." *Id*. at 360. Dr. Rubin indicated that Jill was not capable of performing part-time work, but she assessed

8

no functional restrictions. *Id*. As her reason for discrediting Dr. Rubin's conclusions, the ALJ noted the opinion was "vague and does not provide for any specific work limitations or abilities." *Id*. at 74. The ALJ reasonably found Dr. Rubin's statement not persuasive because she did not provide any medical opinions regarding specific functional limitations related to Jill's impairments. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (doctor's "evaluation did not include a *functional* assessment of [claimant's] abilities, nor did she opine about any limitations [claimant's] impairments may have caused, so her report could not be used to support specific limitations included in [claimant's] residual functional capacity."); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("[g]iven that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best."). Moreover, Dr. Rubin's incapacitation statement was akin to a conclusion that Jill was disabled, which is an issue reserved to the Commissioner. 20 C.F.R. § 404.1520b(c)(3)(i).

### 3. Dr. Lalit Puri and Dr. Victoria Brander

Jill additionally disputes the ALJ's handling of statements from Dr. Puri, the orthopedic surgeon who performed Jill's left hip surgery, and Dr. Brander, her treating physiatrist. When asked whether Jill was capable of performing any occupation on a part-time basis, Drs. Puri and Brander circled "No" on the Work Status Sheet form. (R. 362, 364). The ALJ disregarded the opinions of Drs. Puri and Brander that Jill was not capable of performing any occupation on a part-time basis as "an issue reserved to the Commissioner." *Id*. 74-75. Jill argues that the ALJ was required to consider Drs. Puri's and Brander's opinions based on the supportability and consistency factors in accordance with 20 C.F.R. § 404.1520c. The Commissioner responds that the ALJ was adhering to the regulations in disregarding Drs. Puri's and Brander's opinions about Jill's ability to work.

The ALJ did not err in discrediting Drs. Puri's and Brander's opinions on this sole basis. Under 20 C.F.R. § 404.1520c, an ALJ is required "to evaluate every medical opinion and evaluate the weight given to the opinion." *Garling v. Kijakazi*, 2021 WL 3728544, at *5 (N.D. Ind. July 20, 2021). However, the applicable regulations instruct that "[s]tatements on issues reserved to the Commissioner," such as "[s]tatements that you are or are not . . . able to work" are "inherently neither valuable nor persuasive to the issue of whether you are disabled . . . under the Act." 20 C.F.R. § 404.1520b(c)(3)(i). The ALJ was thus correct that the statements by Drs. Puri and Brander that Jill "is unable to work goes towards an issue reserved to the Commissioner." (R. 74-57); 20 C.F.R. § 404.1520b(c)(3)(i).

Contrary to Jill's argument, the ALJ did not err in failing to discuss the supportability and consistency of such statements. The revised regulations that apply to claims filed on or after March 27, 2017 expressly state that "we will not provide any analysis about how we considered such evidence in our determination or decision, *even under § 404.1520c*." 20 C.F.R. § 404.1520b(c) (emphasis added). "Section 1520b is clear that section 1520c does not require the ALJ to provide any analysis about how statements that a claimant is disabled or unable to work were considered." *Myers v. Saul*, 2021 WL 4025993, at *7 (W.D. Tex. Sept. 3, 2021). Thus, the ALJ was not obligated to justify rejecting Drs. Puri's and Brander's statements that Jill was unable to perform part-time work beyond noting that it is a conclusion reserved to the Commissioner. *Id*. (holding treating rheumatologist's statement that claimant was disabled and unable to work "was not required to be evaluated under the factors listed in 20 C.F.R. § 1520c, including supportability and consistency."); *see also Nicholas M. v. Saul*, 2021 WL 753558, at *3 (C.D. Ill. Jan. 19, 2021); *Scott L. v. Saul*, 2021 WL 1574451, at *3 (D. Me. Apr. 21, 2021) (rejecting argument that ALJ erred in failing to discuss the supportability and consistency factors in assessing physician's

statement that claimant was disabled from performing his job as a police officer because such statement is treated as "'inherently neither valuable nor persuasive,' meriting no discussion by an ALJ.").

Nevertheless, even if the ALJ was required to discuss the consistency and supportability factors, the Court would not remand for further proceedings because any error was harmless. *Dayle B. v. Saul*, 2021 WL 1660702, at *10 (D. Conn. April 28, 2021). The ALJ would clearly reach the same result on remand regarding the persuasiveness of Drs. Puri's and Brander's opinions for several reasons. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). *First*, Drs. Puri and Brander failed to provide any opinions about Jill's specific functional restrictions or limitations, which is a valid reason to discount their opinions, as discussed above. *Second*, Drs. Puri's and Brander's October 2018 statements predate Jill's hip surgery on November 1, 2018, which resolved some of her symptoms. Notes from pre-surgery visits document significant hip symptoms. For example, on June 6, 2018, Dr. Brander wrote that Jill's "[h]ip pain is the #1 issue, interfering with her quality of life." (R. 1316). A month later on July 9, 2018, Dr. Puri noted that Jill's "biggest complaint right now is severe left hip pain that has progressed." *Id.* at 1322. Indeed, Dr. Puri's October 18, 2018 Work Status Sheet focused on Jill's upcoming hip surgery, noting that Jill's treatment plan was surgery on November 1, 2018 and after a 2-3 day hospital stay, she would be discharged for "surgical wound care, pain management, aggressive therapy and rehab., anticoagulation therapy." *Id.* at 361. He wrote that Jill was unable to work because she was "unable to ambulate without assistive device, narcotic pain medication, surgical wound care, [aggressive] physical therapy." *Id.* Significantly, Dr. Puri noted that Jill's restrictions and limitations (which he failed to specify) were not expected to be permanent. *Id.* Dr. Brander's opinion was also based on Jill's pre-surgery condition. Dr. Brander wrote that Jill was to "undergo THA surgery, walks with assistive device.

11

That in combination with autonomic nervous system disorder (POTS) makes it impossible for her to return to work *at this time*." *Id*. at 364 (emphasis added). And Dr. Brander left blank the "yes" or "no" for whether the restrictions and limitations were expected to be permanent. *Id*. at 363. Thus, Drs. Puri's and Brander's statements that Jill could not work only reflect her functioning before, and not after, her successful left hip surgery.

*Third*, Dr. Puri's pre-surgery opinion is inconsistent with the medical record following Jill's hip surgery, including his own notes post-surgery treatment records.[5] As the ALJ found, post-operative physical therapy notes indicate that Jill's strength and left hip range of motion significantly improved. (R. 73, 1406). Her hip precautions were lifted on December 15, 2018. *Id*. at 1507. Three days later, Jill reported only needing a cane at the end of the day around 4:00 p.m. *Id*. at 1392. As of December 21, 2018, Jill was able to ambulate independently without an assistive device to promote a more efficient gait pattern, and on January 14, 2019, Jill complained of no hip pain. *Id*. at 73, 1406. In physical therapy sessions between January and March of 2019, Jill reported that her hip was recovering well and "is the best joint in my body." *Id*. at 1476, 1482, 1485, 1488, 1491, 1494, 1497, 1500, 1503, 1507. During those sessions, Jill also stated that she used a cane by the end of the day due to knee pain. *Id*. As the ALJ further noted, x-rays of Jill's left hip from March 2019 showed well-positioned components. *Id*. at 73, 1573. And x-rays of both knees showed only minimal degenerative changes. *Id*. On March 4, 2019, Dr. Puri wrote that Jill was "doing well" with regard to her left hip and would continue to work diligently with therapy and make this a part of her daily routine. *Id*. at 73, 1574. Dr. Puri assessed "no restrictions." *Id*; *Prill v. Kijakazi*, --- F.4th ----, 2022 WL 121143, at *8 (7th Cir. 2022) (ALJ entitled to give treating

---

[5]     Jill did not return to see Dr. Brander until October 3, 2019, approximately eleven months after her hip surgery and four months after the ALJ's decision. (R. 17).

physician's opinion less weight where his treatment notes indicated claimant was available for unrestricted activity).

*Fourth*, Drs. Puri's and Bander's statements conflict with the conclusion of Dr. Krishnamurthi's testimony at the hearing, which the ALJ found partially persuasive. Dr. Krishnamurthi had the opportunity to review records post-dating the hip replacement surgery and found that Jill was capable of full-time work. *Id*. at 114-15. For these reasons, the Court is confident that the ALJ would reach the same conclusion regarding the persuasiveness of Drs. Puri's and Bander's statements if she considered the supportability and consistency of their statements.

### 4. Dr. Subramanium Krishnamurthi

Jill contends the ALJ erred in evaluating the persuasiveness of Dr. Krishnamurthi's opinion. "An ALJ may obtain a medical expert's opinion for several reasons, including in relevant part, 'to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing' and to determine the claimant's residual functioning capacity." *Gebauer v. Saul*, 801 F. App'x 404, 407 (7th Cir. 2020). "The use of a medical expert can help ALJs resist the temptation to 'play doctor' . . . by evaluating medical evidence on his or her own." *Id*. at 408. Further, "[a] medical expert may be especially helpful when evaluating the severity of a condition—like fibromyalgia—marked by subjective and fluctuating symptoms." *Id*. at 409.

Dr. Krishnamurthi had an opportunity to review the record and also heard Jill's testimony regarding her symptoms and limitations. Dr. Krishnamurthi testified that Jill's impairments were chronic migraine headaches, Ehlers-Danlos syndrome, arthritis of the left hip for which she had surgery, bilateral knee osteoarthritis, peripheral neuropathy, fibromyalgia and chronic pain

syndrome, and degenerative joint disease of the lumbar spine. (R. 114-15). He opined that Jill could lift and carry twenty pounds occasionally and ten pounds frequently. *Id*. at 115. He also found that Jill could sit for six hours and stand/walk for two hours in an eight-hour workday, frequently reach, handle, finger, feel, and grasp, occasionally climb stairs, bend, stoop, kneel, crouch, and crawl, could not climb ladders, ropes or scaffolds, and should avoid heights and heavy machinery.[6] *Id*. In finding Dr. Krishnamurthi's opinion partially persuasive, the ALJ concluded that Dr. Krishnamurthi's opinion was consistent with and supported by the record as whole. *Id*. at 75. The ALJ also decided that the record as a whole supported certain greater limitations than the opinion of Dr. Krishnamurthi. *Id*. Specifically, the ALJ rejected lifting and carry limitations identified by Dr. Krishnamurthi's opinion because the overall record of evidence, including Jill's testimony regarding her symptoms and limitations, supported sedentary lifting restrictions. *Id*.

The ALJ was within her discretion to favor Dr. Krishnamurthi's opinion over the opinions of her treating physicians. As required by the regulations, the ALJ explicitly assessed the persuasiveness of Dr. Krishnamurthi's opinion by considering its supportability and consistency, the two key factors identified in the revised regulations. (R. 75). The ALJ ultimately found Dr. Krishnamurthi's opinion partially persuasive and adequately explained her reasons for doing so. The ALJ stated that Dr. Krishnamurthi's opinion regarding Jill's manipulative and postural limitations was consistent with and supported by the record as a whole. *Id*. The ALJ also explained that the overall record, including Jill's testimony regarding her symptoms and limitations, supported greater lifting limitations than assessed by Dr. Krishnamurthi. *Id*.

---

[6]     Dr. Krishnamurthi's lifting limitation opinion is consistent with light work (*see* 20 C.F.R. § 404.1567(b)), but his limitation of two hours total standing and walking and six hours total of sitting is consistent with sedentary work (*see* 20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251, at *5 (1983)).

Specifically, earlier in the decision, the ALJ discussed Jill's treatment records, noting medical evidence which supports the limitations in Dr. Krishnamurthi's opinions. For example, the ALJ noted that in late 2016 and early 2017, despite some weakness due to pain on testing of the left lower extremity, Jill demonstrated normal gait, posture, and strength. *Id*. at 72 (citing *id*. at 378, 384, 521, 711). The ALJ also noted that during this period, Jill's physical examinations were generally unremarkable except for paraspinal muscle tenderness and tenderness on palpitation of the lower extremities. *Id*. (citing *id*. at 377, 383). The November 8, 2016 progress note cited by the ALJ indicates that Jill performed rapidly alternating movements well with her upper extremities and her right hand tremor did not occur when she was distracted or at rest. *Id*. at 711. The ALJ also pointed out that Jill was able to rise from a chair without using her arms. *Id*. at 72 (citing *id*. at 384). The ALJ further noted that in 2017, Jill was diagnosed with a small fiber neuropathy based on an abnormal sweat test with anhidrosis in the feet but had a normal electromyographic test. *Id*. (citing *id*. at 534, 751). The ALJ noted that a July 2017 MRI of Jill's left hip showed left acetabular labral tearing, mild/moderate degenerative change at the left hip with edema signal and subchondral cyst formation in the acetabulum, and left hip effusion. *Id*. at 72-73 (citing *id*. at 1270. The ALJ also acknowledged that with respect to Jill's left hip, she failed conservative treatment, including exercise, physical therapy, medications and injections. *Id*. at 73 (citing *id*. at 1322-23).

Moreover, the ALJ considered that a January 2018 lumbar spine MRI indicated only mild degenerative changes with no sign of spondylolysis or spondylolisthesis. *Id*. at 73 (citing *id*. at 1304-05). The ALJ specifically noted that Jill underwent left hip surgery in late 2018, after which she exhibited significantly improved hip strength and hip range of motion as well as resolution of hip pain. *Id*. (citing *id*. at 1406). In addition, the ALJ considered that by January 2019, Jill reported

no hip pain and had met her goal to ambulate independently without a device to promote a more efficient gait pattern. *Id*. Significantly, in March 2019, Jill's orthopedic surgeon Dr. Puri noted that Jill was doing well with regard to her left hip and assessed no restrictions. *Id*. (citing at *id*. at 1574). Finally, the ALJ cited Jill's March 4, 2019 x-rays of her knees which revealed minimal degenerative changes. *Id*. (citing *id*. at 1573). The ALJ's conclusion that Dr. Krishnamurthi's opinion was consistent with and supported by the record is supported by more than a mere scintilla of evidence, and the ALJ also applied the proper legal standards.

Jill maintains that the ALJ's supportability determination was not justified because Dr. Krishnamurthi did not provide an explanation for the limitations he identified and he testified that he refers patients dealing with chronic pain to pain management specialists. "Generally speaking, '[an] expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Stephanie G. v. Saul*, 2021 WL 2660768, at *7 (N.D. Ill. June 29, 2021). "But there were no obstacles to cross-examination here." *Id*. Jill's attorney could have "cross-examined the expert about [his] opinions and the evidence used to support it," but she did not ask the medical expert about the supportability of his opinion, other than to ask him whether he had ever treated anybody with chronic pain. (R. 117); *Gebauer*, 801 F. App'x at 409. This left the medical expert's opinion "unchallenged until plaintiff filed her brief, which is a little too late for practical purposes." *Stephanie G.*, 2021 WL 2660768, at *7. Under these circumstances, it was not unreasonable for the ALJ to partially rely on Dr. Krishnamurthi's opinion.

Jill also contends that Dr. Krishnamurthi was not qualified to give testimony about Jill's functional limitations from her impairments because he did not specialize in her primary conditions of hypermobile Ehlers Danlos syndrome, autonomic dysfunction, chronic fatigue, and fibromyalgia and he testified that he referred patients with chronic pain to a pain management

specialist. (R. 117). Dr. Krishnamurthi is board certified in internal medicine and cardiology with many years of experience. *Id*. at 1239-40. Dr. Krishnamurthi's specialty in internal medicine did not disqualify him from testifying. *Nicole P. v. Kijakazi*, 2021 WL 3290855, at *4 (N. D. Ill. Aug. 2, 2021) ("The fact that Dr. Stein was an internist is not enough to discount his opinion completely."); 20 C.F.R. § 404.1520c(4) (specialist "may be more persuasive"). "A medical source's specialty is just one factor to consider when evaluating the opinion." *Nicole P.*, 2021 WL 3290855, at *4; 20 C.F.R. § 404.1520c(c). Moreover, Jill's attorney could have, but did not, raise concerns regarding Dr. Krishnamurthi's qualifications at the administrative hearing. (R. 114-17). Because Jill was represented by counsel at the hearing, she is "presumed to have made [her] best case before the ALJ." *Matthews v. Saul*, 833 F. App'x 432, 436 (7th Cir. 2020); *Maxfield v. Astrue*, 2008 WL 424313, at *8 (S.D. Ind. Feb. 13, 2008) (Hamilton, J.) (presence of a testifying internist rather than a rheumatologist to assist in determining claimant's RFC given her history of fibromyalgia was not *per se* unreasonable where plaintiff's counsel did not object to the medical expert's testimony at the hearing or ask the medical expert any questions). Furthermore, Jill's counsel had the opportunity to explore whether Dr. Krishnamurthi had experience treating patients with Jill's impairments at the hearing but did not do so. (R. 114-17); *Gebauer*, 801 F. App'x at 409 (finding no err in ALJ affording great weight to the opinion of the medical expert, a board-certified internist who had experience treating patients with fibromyalgia). Finally and without more, Jill has not shown that the fact that Dr. Krishnamurthi, an internal medicine specialist, testified that he refers patients with chronic pain to a pain management specialist renders him unqualified to opine on the combined impact of Jill's impairments on her ability to work, even though his opinion "may be more persuasive" if he were a specialist. 20 C.F.R. § 404.1520c.

Jill also contests the ALJ's reliance on Dr. Krishnamurthi's opinion based on his testimony that he did not see the contrary treating opinions in his review of the record. (R. 115-16). After the ALJ pointed out that the treating physicians' "Work Status Sheet" forms where "in the wrong section . . . of the exhibit file," Jill's counsel could have asked the medical expert about the contrary treating opinions, but she did not. (R. 116). Nevertheless, she faults the ALJ for failing to ask Dr. Krishnamurthi why his opinion was contrary to the treaters. Doc. 30 at 1. "True, the ALJ could have asked the expert herself, but it is[Jill's] burden, not the ALJ's to prove that [s]he is disabled." *Matthews*, 833 F. App'x at 436.

For all of these reasons, the ALJ did not err by partially relying on the opinion of testifying medical expert Dr. Krishnamurthi over the medical source opinions of Drs. Barboi, Rubin, Puri, and Brander that predate Jill's successful hip surgery, and she adequately explained her reasons for doing so. Where there is conflicting medical expert opinions, the ALJ must resolve such evidentiary conflicts. *Lafayette v. Berryhill*, 743 F. App'x 697, 699 (7th Cir. 2018) ("weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). Although Jill may disagree with the ALJ's assessment, this Court may not reweigh evidence and resolve conflicts. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

## B.    Jill's Subjective Symptoms

Next, Jill argues that the ALJ improperly discounted her subjective symptom allegations. "An ALJ's findings concerning the intensity, persistence, and limiting effect of claimant's symptoms must be explained sufficiently and supported by substantial evidence." *Ray v. Saul*, 861 F. App'x 102, 107 (7th Cir. 2021). In evaluating a claimant's subjective symptoms, "an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020); 20 C.F.R. §

404.1529(c). The Court will not reverse an ALJ's subjective symptom conclusions unless they are "patently wrong, meaning they lack any explanation or support." *Anders v. Saul*, 860 F. Appx. 428, 434 (7th Cir. 2021) (internal quotes omitted); *Ray*, 861 F. App'x 102, 107 ("Patently wrong is a high threshold.").

The ALJ found Jill's statements about the intensity, persistence and limiting effects of her symptoms partially supported. (R. 71-72, 73). The ALJ credited some of Jill's subjective symptoms by limiting her to a reduced range of sedentary work and acknowledging her pain, fatigue, joint stiffness, and limited range of motion. *Id*. at 75. However, the ALJ found the extent of Jill's subjective allegations and their effects inconsistent with the medical evidence and her daily activities. *Id*. at 73. These reasons are sufficient to support the ALJ's partially adverse subjective symptom determination. *Atkins v. Saul*, 814 F. App'x 150, 155 (7th Cir. 2020); *see also Prill*, 2022 WL 121143, at *7 (upholding ALJ's evaluation of claimant's subjective allegations where, among other evidence, claimant's treating physician indicated she was available for unrestricted activity). Specifically, the ALJ explained that: Jill's gait, posture, and strength were normal at numerous examination; diagnostic imaging of Jill's lumbar spine and knees revealed minimal degenerative changes; and recent medical evidence established that Jill was doing well after her left hip surgery and no restrictions were assessed. (R. 73). In addition, the ALJ noted that that despite her claim of disabling symptoms and limitations, Jill reported that she swam 30 laps twice a week and rode a recumbent bike 40 to 50 minutes twice a week, and that she could prepare all family meals, drive daily, shop for groceries, and do laundry with some assistance. *Id*.

Regarding the ALJ's evaluation of the medical evidence, Jill objects that the ALJ improperly failed to consider her chronic pain and fatigue due to her Ehlers Danlos syndrome, chronic fatigue syndrome, and fibromyalgia. Doc. 19 at 9, 11. Jill points to her statements that she

spends about four hours a day resting and needs to take a break every two hours for 5-10 minutes. *Id*. at 9. An ALJ "is prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). Contrary to her assertion, the ALJ did not ignore evidence of Jill's chronic pain and fatigue. The ALJ recognized that Jill's EDS and fibromyalgia/chronic pain syndrome were severe impairments. (R. 67). The ALJ also discussed Jill's history of reported pain and fatigue (*id*. at 72-73) and her testimony that she experiences pain and fatigue and rests by lying down two to four hours a day (*id*. at 71, 73), but found her impairments and allegations of pain and fatigue did not prevent her from performing a reduced range of sedentary work. *Id*. at 73, 75. While the ALJ did not specifically mention Jill's statement about needing to take a "5-10 minute break about every two hours after sitting or active times" (R. 302), an ALJ is not required to discuss "every piece of evidence in the record." *Wright v. Kijakazi*, 2021 WL 3832347, at *5 (7th Cir. 2021). Moreover, the ALJ explicitly considered Jill's similar statement that she could sit for sixty to ninety minutes at one time and her testimony that she could sit for two hours at a time. (R. 71). The ALJ further cited to Exhibit 4E, the portion of the record where Jill reported needing a break every two hours after sitting or active times, showing that she adequately considered Jill's claim in this regard. *Id*. Jill's remaining arguments regarding the ALJ's consideration of the medical evidence largely repeat her arguments concerning the ALJ's weighing of the medical opinion evidence. *See* Doc. 19 at 9-10. None of these arguments have merit, and the Court rejects these arguments for the same reasons described above.[7]

---

[7] Jill raises an additional argument about the waxing and waning nature of fibromyalgia symptoms and claims that the ALJ failed to consider this component of her fibromyalgia and Ehlers Danlos syndrome, but Jill waived this argument by raising it for the first time in her reply brief. *See Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011) ("Carter waived this argument by raising it for the first time in his reply brief.").

Regarding her daily activities, Jill criticizes the ALJ for relying on exercise which is part of her treatment plan to discredit her subjective symptom statements. As the ALJ noted, Jill testified that as part of her treatment plan, she swims two days per week for one hour each time and completing 30 laps, and rides a recumbent bike for 40 to 50 minutes two times per week. (R. 71, 73, 103-04). The Court does not find reversible error in the ALJ's consideration of Jill's swimming and stationary biking. The ALJ cited Jill's swimming and stationary biking in the context of assessing whether her daily activities were consistent with her complaints of disabling symptoms and limitations. (R. 73). This is not a situation where the ALJ discounted a claimant's allegations based on a physician's general recommendation that she exercise and the claimant's actual ability to exercise did not undermine her alleged limits. *See Gerstner*, 879 F.3d at 264 ("general recommendations of physical activity do not contradict [claimant's] alleged limits from fibromyalgia" and the claimant was "totally inactive" at the time of the hearing). Nor did the ALJ fail to consider the exact nature and extent of Jill's exercises in discounting her reported symptoms and limitations as the ALJ did in *Banks v. Berryhill*, 2017 WL 4150618 (N.D. Ill. Sept. 19, 2017), cited by Jill. *Id*. at *11 (holding ALJ should have considered the nature of claimant's home exercise plan, including his testimony that he did "some stretching with a band, little leg lifts, and small calisthenics" and he "tried walking, but only for 15 minutes at a time."); *see also Williams v. Berryhill*, 2017 WL 4699242, at *6 (N.D. Ill. Oct. 19, 2017). Finally, this is not a case where the ALJ improperly equated claimant's walking ability with an ability to work full time. *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014); *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) (ALJ failed to consider the difference between being able to engage in sporadic physical activities like walking and being able to work eight hours a day five consecutive days a week). In

contrast, the ALJ here relied on the swimming and stationary biking Jill described as being inconsistent with her allegation of disabling pain and fatigue.

That said, the ALJ did not rely solely on Jill's swimming and stationary biking to conclude that her symptoms and limitations were not as severe as she claimed. Thus, any error the ALJ may have made in this regard was harmless given the other valid reasons adequately supported by the record the ALJ gave for partially discounting Jill's subjective statements, namely the lack of support in the medical record and Jill's own statements that she could drive daily, shop for groceries, prepare all family meals, and wash laundry with assistance. *Wilder v. Kijakazi*, --- F.4th ----, 2022 WL 34780, at *8 (7th Cir. 2020) (emphasizing harmless error standard applied to judicial review of administrative decisions); *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (citations omitted) (emphasis in original) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are, and here the ALJ cited other sound reasons for disbelieving Halsell."). Overall, the Court concludes that the ALJ's subjective symptom finding is supported by more than a mere scintilla of evidence and a reasonable mind can accept the ALJ's conclusion.

## C.     Residual Functional Capacity Assessment

Jill next argues that the ALJ's RFC determination did not account for the symptoms and limitations associated with her depression, neuropathy, migraines, and her antalgic gait and cane use. "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675076 (7th Cir. 2008). Jill's challenges to the RFC are not well-taken.

Regarding Jill's depression, the ALJ concluded at step two that Jill's mental impairments were non-severe. (R. 67-69). She acknowledged that Jill testified to having depression and anxiety issues and noted that Jill has undergone individual psychotherapy since March 2017. *Id*. at 67. The ALJ proceeded to consider these mental impairments under the "paragraph B" criteria. *Id*. at 68-

69. Consistent with the opinions of the state agency psychological consultants, the ALJ concluded that Jill had: (1) no limitation in understanding, remembering, or applying information; (2) no limitation in interacting with others; (3) mild limitations in concentrating, persisting, or maintaining pace; and (4) no more than a mild limitation in adapting or managing oneself. *Id*. at 68-69, 129, 155. The ALJ did not include any mental-impairment-based limitations in the RFC.

Jill maintains that evidence following the state agency psychologists' reviews of the record could have impacted their opinions relating to her ability to maintain attention and pace and presumably, the RFC would be different. "Not all new evidence" following the state agency consultants' opinions will require a remand. *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021). The relevant question is "whether the new information 'changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report.'" *Id*. (citation omitted).

Jill has not shown that any of the evidence she mentions would have affected the state agency psychologists' assessment of her mental impairments. Doc. 19 at 12. The additional evidence cited by Jill includes a reference to a neuropsychological assessment reflecting cognitive difficulties in the area of working memory and speed mentioned in Jill's progress note from Lakeshore Psychology Group dated October 2, 2018. (R. 1491). However, this appears to refer to an assessment of Jill's son, not Jill. *Id*. Jill additionally cites generally to her therapy records with Martine Gorstein, Psy.D., at Lakeshore Psychology Group from January 1, 2018 through February 13, 2019. *Id*. at 1410-44. In fact, some of this evidence pre-dates the state agency psychologist's review on reconsideration on April 6, 2018 and he considered evidence from Lakeshore Psychology Group. *Id*. at 149-51, 1432-40. Jill offers no explanation or argument of how the subsequent progress notes from Dr. Gorstein would have altered the opinions of the state agency

psychologists.  Moreover, Dr. Gorstein's letter dated February 13, 2019 is almost identical to her letter dated March 5, 2018, which existed prior to the state agency psychologist's review on reconsideration. *Id*. at 1237-38, 1410-11.  Finally, Dr. Rubin's progress note mentioning kinesiophobia with motor planning problems and maladaptive pain avoidance patterns is not new as it is dated January 10, 2018 and was explicitly considered by the state agency psychologist on reconsideration. *Id*. at 156, 1037.

Jill argues that the ALJ erred in finding her neuropathy severe and then failing to provide any limitations in the RFC.  Jill cites evidence of decreased sensation to her hands and feet, sensory symptoms, neuropathy to all extremities, inability to go barefoot, hand stiffness, and difficulty with loading throughout her left lower extremity. Doc. 19 at 12-13.  The ALJ explained, however, that she included postural, manipulative, and environmental limitations to accommodate Jill's complaints of pain, joint stiffness, limited range of motion, and fatigue. (R. 75).  The ALJ limited Jill to: never climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequently reaching, handling, fingering, and feeling bilaterally; and occasional exposure to unprotected heights and dangerous heavy moving machinery. *Id*. at 70.  The ALJ cited Dr. Krishnamurthi's opinion as support for her conclusion that Jill could perform sedentary work with these postural, manipulative, and environmental limitations. *Id*.  Other than Dr. Barboi, whose opinion the ALJ reasonably rejected, Jill did not present an opinion from a treating or examining physician indicating that Jill had any functional limitations greater than those in the RFC.  Accordingly, the Court finds no error in the ALJ's assessment of Jill's neuropathy in the RFC. *Pate v. Kijakazi*, 2021 WL 3627118, at *3 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

Citing a treatment note of Dr. Rubin purportedly showing that Jill's migraines are aborted by sleep and relaxation and aggravated by light, noise, fatigue and neck stiffness, Jill contends that the ALJ made no RFC accommodation for her migraines.[8] (R. 719). But, as the ALJ noted, Jill had a significant improvement in her headaches, with only about one headache occurring per month. *Id*. at 72, 521, 751; *see also id* at 714 (Jill reporting to Dr. Rubin that "[t]he only thing she doesn't have any more is headaches."). Moreover, Dr. Rubin offered no functional limitations related to Jill's migraines, and Jill does not identify any doctor's opinion or specific medical evidence that would have supported a migraine restriction. *Id*. at 361. Nor does she identify a specific additional work restriction that she believes should have been included in the RFC to account for her migraines. *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019). Therefore, more than a mere scintilla of evidence supports the ALJ's failure to include a limitation for Jill's migraines in the RFC.

Finally, Jill asserts that the ALJ failed to recognize the significant evidence that she ambulates with an antalgic gait and uses a cane. To the contrary, the ALJ recognized that Jill's gait had been documented as normal at times (R. 72), but she also considered evidence that Jill had an abnormal gait in January 2018. *Id*. at 73, 1307. The ALJ acknowledged that with respect to Jill's left hip, she failed conservative treatment, including exercise, physical therapy, medications and injections, ultimately undergoing surgery. *Id*. at 73, 1322-23. The ALJ further noted that Jill did not require an assistive device to ambulate independently on December 21, 2018, almost two months after her left hip surgery. *Id*. at 73, 1406. The physical therapy records between January and March 2019 note that Jill reported only using a cane "by [the] end of [the] day" due

---

[8] In fact, Dr. Rubin's March 7, 2017 progress notes states: "sensitivity to light, sensitivity to noise, dizziness, fatigue, allodynia, and neck stiffness (*Most of her sensitivities are due to her chronic pain and not really the headaches*)." (R. 719) (emphasis added).

to knee pain. *Id*. at 1476, 1482, 1485, 1488, 1491, 1494, 1497, 1500, 1503, 1507. The ALJ explicitly considered Jill's testimony that she sometimes uses a "cane in the evenings when [her] body is more fatigued." *Id*. at 95. Again, Jill ignores her documented improvement after hip surgery, including Dr. Puri's statement that she was "doing well" and had "no restrictions." (R. 73, 74, 1574). Moreover, the physical therapy records after Dr. Puri assessed no restrictions fail to show an abnormal gait. *Id*. at 1476-78, 1482-87. An ALJ may not ignore an entire line of evidence contrary to her conclusion but need not mention every piece of evidence. *Johnson v. Berryhill*, 758 F. App'x 543, 545 (7th Cir. 2019). Given the above record, the ALJ adequately recognized Jill's abnormal gait and cane usage and fulfilled that duty here. And most importantly, Jill has not explained how an antalgic gait and the need for a cane at the end of the day conflicts with the limited standing and walking requirements of the RFC's reduced range of sedentary work. During the hearing, Jill's attorney did not ask the VE if her answers regarding Jill's past work or the sedentary jobs identified by the VE would be different if the hypothetical individual had an antalgic gait and sometimes relied on a cane at the end of the day or in the evenings. (R. 122).

## D. Step Four Determination

Lastly, Jill takes issue with the ALJ's step four finding that she could perform her past relevant work as a user support analyst supervisor and vice president as generally performed. First, Jill argues that the ALJ erred because she did not perform the job of a user support analyst supervisor. Second, Jill argues that her prior vice president role appears to be a composite job that combined the elements of a consultant and vice president and thus, the ALJ should not have considered how the job is generally performed.

The Court need not reach these issues because any error in the ALJ's step four finding is harmless. Although the VE did not opine as to whether any other jobs existed in significant numbers in the national economy for a hypothetical individual with the RFC assigned by the ALJ

to Jill, the VE did testify that jobs would be available if Jill had the RFC found by the ALJ and was also limited to simple routine tasks and simple work-related decisions. If a person was limited to simple routine tasks and simple work-related decisions, she would be more limited than the RFC found by the ALJ, which included no mental limitations. Thus, regardless of Jill's ability to perform her past jobs as they were generally performed in the economy, the VE testified that an individual of Jill's age, education and work experience, who had the RFC to perform an even more limited range of sedentary work than found by the ALJ, could perform the jobs of a document preparer, telephone information clerk, and charge account clerk. (R. 121). Jill's step four argument does not affect these jobs, and Jill does not challenge these alternative step five sedentary jobs. Thus, the ALJ's decision would be the same under step five, and any error at step four is harmless. *Guranovich v. Astrue*, 465 F. App'x 541, 543 (7th Cir. 2012).

## CONCLUSION

For the reasons stated above, Plaintiff's request for reversal and remand is denied, the Acting Commissioner's Motion for Summary Judgment [24] is granted, and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of the Acting Commissioner and against Plaintiff.

**SO ORDERED.**

Dated: January 26, 2022

_____

Sunil R. Harjani
Un`ited States Magistrate Judge